## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI

| | |
|---|---|
| CLIFFORD ELOW, derivatively and on behalf of EXPRESS SCRIPTS HOLDING COMPANY,<br><br>          Plaintiff,<br><br>   v.<br><br>GEORGE PAZ, TIMOTHY WENTWORTH, ERIC SLUSSER, JAMES M. HAVEL, DAVID QUELLER, CHRISTOPHER A. MCGINNIS, CHRISTOPHER K. KNIBB, GARY G. BENANAV, MAURA C. BREEN, WILLIAM J. DELANEY, ELDER GRANGER, NICHOLAS J. LAHOWCHIC, THOMAS P. MAC MAHON, FRANK MERGENTHALER, WOODROW A. MYERS, JR., RODERICK A. PALMORE, WILLIAM L. ROPER, and SEYMOUR STERNBERG,<br><br>          Defendants,<br><br>   and<br><br>EXPRESS SCRIPTS HOLDING COMPANY,<br><br>          Nominal Defendant. | C.A. No.<br><br><br>**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED**<br><br><br><br>**REDACTED VERSION**<br><br>**UNREDACTED VERSION FILED UNDER SEAL** |

Plaintiff Clifford Elow ("Elow" or "Plaintiff"), by and through his undersigned attorneys, brings this stockholder derivative action in the name and on behalf of nominal defendant Express Scripts Holding Company ("Express Scripts" or the "Company") against certain current and/or former directors and officers of Express Scripts named herein (the "Individual Defendants") for breaches of fiduciary duties, corporate waste, and violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act").  Plaintiff bases his allegations on personal knowledge as to his own acts, and on information and belief as to all other allegations, based upon due investigation by counsel, including:  (a) review of confidential Express Scripts' records

obtained by means of an action in the Delaware Court of Chancery to enforce Plaintiff's rights to inspect the Company's books and records pursuant to 8 *Del. C.* § 220 (the "Section 220 Action"); (b) review and analysis of public filings made by Express Scripts and other persons with the United States Securities and Exchange Commission ("SEC"); (c) review and analysis of press releases and other publications caused to be disseminated by certain of the Individual Defendants and other persons; (d) review of news articles, stockholder communications, and postings on Express Scripts' website concerning the Company's public statements; (e) review and analyses of complaints and other related materials in litigation commenced by and/or against the Company and/or its affiliates; and (e) review of other publicly available information concerning Express Scripts and other persons.

## INTRODUCTION AND OVERVIEW

1.      This is a stockholder derivative action brought by a stockholder of Express Scripts on behalf of the Company against the Individual Defendants seeking to remedy their violations of state and federal law during the relevant period that have caused and continue to cause substantial monetary losses to Express Scripts and other damages, including damages to the Company's reputation and goodwill.  On behalf of Express Scripts, this action seeks damages and corporate governance reforms to remedy the Individual Defendants' violations of law.

2.      During the relevant period, the Individual Defendants caused or allowed Express Scripts to issue or make materially false and misleading statements and omissions (or fail to correct false and misleading statements and omissions) concerning the Company's relationship with its largest commercial customer, Anthem Inc. ("Anthem").  Additionally, the Individual Defendants caused or allowed Express Scripts to file false and misleading statements and omissions with the SEC.  The Individual Defendants further caused or allowed Express Scripts to

2

breach its contract with Anthem due to operational breaches and failure to negotiate, resulting in Anthem filing a breach of contract action against the Company seeking to terminate the relationship early (and the Company, in turn, counter-suing for breach of contract) and thereafter announcing that it would not be renewing its contract with the Company.

3.      In 2009, Express Scripts, Inc. ("ESI") entered into a Pharmacy Benefits Management ("PBM") contract (the "Agreement") with Anthem[1] for a 10-year term as part of ESI's purchase of a number of Anthem subsidiaries.

4.      At that time, ESI amortized the costs of the Agreement and relationships related to the Agreement over a 15-year period, representing to both the SEC and the investing public that there was a "high probability" that Anthem would renew the contract for five years beyond its original expiration date, and accordingly, that amortizing the contract over a 15-year period was appropriate.

5.      In 2012, ESI merged with Medco Health Solutions, Inc.[2] (the "Merger").  At that time, Express Scripts was created, and ESI became a wholly-owned subsidiary of Express Scripts.

6.      Between 2012 and 2015, Anthem accounted for approximately 12 to 16% of Express Script's revenues each year, totaling $12.9 to $16.6 billion.  In 2016, Anthem accounted for 17% of the Company's revenues.

7.      After the Merger, Express Scripts continued to amortize the Agreement over a 15-year period, as it stated in its public filings.

---

[1] At the time, Anthem was known as WellPoint, Inc.  To avoid confusion, "Anthem" is used to refer to both Anthem Inc. and WellPoint, Inc. throughout this Complaint.

[2] Medco Health Solutions, Inc. is hereinafter referred to as "Medco."

8.     Under Generally Accepted Accounting Principles ("GAAP"), once it was no longer probable—meaning there was a 75% to 80% likelihood of it not occurring—that the Agreement would be renewed for an additional five years, Express Scripts was obligated to adjust its amortization schedules.

9.     Today, Express Scripts is a holding company that solely operates through its wholly-owned subsidiaries, primarily ESI and Medco.  Specifically, the executive officers and management of Express Scripts simultaneously act as the executives and management of ESI and of Medco in St. Louis, Missouri.

10.     ESI continues to be a party to the Agreement.

11.     Section 3.1(a) of the Agreement requires ESI to perform its PBM services in a "prudent and expert manner."

12.     Section 5.6 of the Agreement allows Anthem to conduct a market analysis of drug prices every three years.  If Anthem were to determine that ESI's drug pricing terms were not competitive, then Anthem could propose renegotiated pricing terms, and ESI and Anthem were obligated to negotiate in good faith over the proposed new terms.

13.     Section 6.2(a) of the Agreement allows for its termination by either party in the event of failure to comply with a material contract term, followed by a failure to cure.

14.     Section 16.5 of the Agreement provides that no party will exercise its termination rights without engaging in a three-step resolution process.  The first step is a meeting of the parties' Joint Pharmacy Operating Committee ("JPOC") which has 15 days to attempt to resolve the dispute; the second is a meeting of the parties' presidents, who also have 15 days; and the third step is mediation.

15.     Section 4.11 of Exhibit I to the Agreement states that ESI is "responsible for collecting, creating and submitting [prescription drug event ("PDE")] files to [Centers for Medicare & Medicaid Services ("CMS")] containing claims data as required by CMS in the format and timeframe as specified by CMS."

16.     Section 4.11.3 of Exhibit I to the Agreement states that ESI is "responsible for receiving the PDE response files from CMS, processing the PDE response file, resolving any [ESI] owned errors, and resubmitting impacted records with resolved errors to CMS for acceptance with [a certain amount of time] of receipt."

17.     Section 4.11.7 of Exhibit I to the Agreement states that where ESI "is made aware of Member overpayment due to incorrect Cost Share, [ESI] shall promptly refund the amount of the overpayment to the Covered Individual or the Covered Individual's designee."

18.     Section 4.11.9 of Exhibit I to the Agreement requires that ESI ensure that PDE systems and processes are designed, modified, and tested well in advance of the effective date of changes initiated by CMS or ESI.

19.     In Section 7.2 of Exhibit I to the Agreement, Anthem delegated to ESI its responsibility under its Medicare Part D contract with CMS to provide the services set forth in the Agreement to Medicare Part D Covered Individuals.  This section states that Anthem "may revoke this delegation, including, if applicable, the delegated responsibility to meet CMS reporting requirements, and thereby terminate the Agreement if CMS or [Anthem] determines that [ESI] has not performed satisfactorily."

20.     Shortly before 2012, on the Agreement's three-year anniversary, Anthem exercised its rights under Section 5.6 and proposed new pricing terms.  Negotiations over the pricing terms lasted nearly a year, during which ESI and then Express Scripts disclosed in their

5

public filings that the negotiations between ESI and Anthem "involved [] a contractual dispute regarding certain terms of the [] Agreement" and that Anthem "ha[d] raised the possibility of litigation" to resolve the dispute.

21.     At that time, the Agreement was amended in the form titled: Amended Restated Pharmacy Benefit Management Services Agreement.  It is this version of the Agreement that governs the relationship between Express Scripts (through ESI) and Anthem.

22.     In light of the lengthy 2012 Section 5.6 negotiating process, Anthem reached out to ESI to start the 2015 benchmark pricing process early.  In October 2014, Anthem requested $13 billion in pricing concessions over the remaining contract term, as well as $1.8 billion in post-termination pricing concessions.  In response, ESI took the position that it was not required to provide competitive benchmark pricing.

23.     Concurrent with these events, Anthem began to experience pervasive systemic defects in ESI's IT infrastructure, failure by ESI employees to devote sufficient resources to obligations under the Agreement, and other operational breaches.

24.     On February 16, 2015, Anthem sent a notice of default to ESI, asserting that the Company had failed to perform its PBM in a "prudent and expert manner" as contractually required.

25.     ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
██████

26.     Over the next year, Express Scripts and ESI's relationship with Anthem steadily deteriorated, and Anthem began to take the three steps necessary to cancel its contract with ESI under Section 16.5 of the Agreement.

27.     Meanwhile, ESI continued to assert that it was not obligated to provide competitive benchmark pricing at all, and that it would only agree to pricing concessions if Anthem agreed to a contract extension.

28.     By July 2015, the parties had not budged from their initial positions—Anthem required significant pricing concessions, and ESI asserted it was not obligated to give them.  On July 27, 2015, Anthem took the final step in the contract cancellation process, filing for non-binding mediation.

29.     ███████████████████████████████████████████████████████
███████████████████████████████████████████████

30.     Following the July 27, 2015 filing, the parties engaged in additional attempts to start pricing negotiations, but a meeting in September went nowhere.  Letters exchanged in October 2015 reiterated that each side refused to budge from their initial position.

31.     On November 10, 2015, the parties met for mediation.  Recognizing early on that the parties were at an impasse, the mediator called off the session on the first day.  ████████
███████████████████████████████████████████████████████
███████████████████

32.     Unlike in 2012, however, this time Express Scripts' directors and officers failed to inform the Company's stockholders that the Company's relationship with its largest customer was imperiled, and that Anthem had taken all steps required to seek termination of the Agreement.

33.     Indeed, not only did Express Scripts' directors and officers not inform the Company's investors that the Agreement was on the brink of termination due to alleged material servicing breaches and the Company's representatives' unwillingness to budge on drug pricing

and negotiate in good faith, the Company's filings continued to represent that the Agreement would likely be extended for five years beyond the 2019 expiration date and amortized it according to that representation.

34.    Indeed, when asked by analysts about the state of the Anthem market check negotiations, Express Scripts' officers dissembled, omitted key information, and/or made misleading statements ███████████████████████████████

35.    The various misstatements and omissions related to the Agreement are described in greater detail below.  *See infra* ¶¶115-227.  As an example, during a December 22, 2015 conference call with investment analysts, Express Scripts' then Chief Executive Officer ("CEO") Defendant George Paz ("Paz") represented that the Company was "excited to continue productive discussions with Anthem."  When asked by an analyst specifically about the earnings risk related to the Anthem negotiations, Defendant Paz specifically downplayed any risk, and affirmatively represented that the market price check was common and in line with other price checks for other ESI customers.

36.    What Defendant Paz did not tell investors was that the Company (and an outside mediator) had recognized that negotiations were at an impasse, ████████████████████████ ██████████████████████████████████████ and that Anthem had completed every step necessary to terminate the Agreement.

37.    The parties fruitless attempts at a dialogue continued, and in January 2016, Anthem CEO Joseph Swedish ("Swedish") publicly disclosed that Anthem was entitled to a significant amount of additional savings from its current agreement with Express Scripts, and he expected Express Scripts to negotiate "in good faith" regarding contract repricing, but also

emphasizing that Express Scripts had not made an offer that Anthem believed represented competitive pricing.

38.    After Swedish's disclosure, ESI's position hardened further.  Repeated Anthem proposals met either with silence, or an assertion that ESI was not obligated to renegotiate pricing.  On February 5, 2016, Anthem informed ESI that it "cannot continue under ESI's current pricing."

39.    Less than two weeks later, however, Express Scripts filed its Form 10-K for the year ending December 31, 2015 with the SEC, in which investors were informed that not only was the Agreement to run its full term, but that representatives of the Company expected that the Agreement would be renewed for an additional five years.

40.    In conference calls following the release of the 10-K, Defendant Paz emphasized that the parties were in discussions, that the price check was routine, and that the Company was focused on reaching an agreement.  He did not inform investors that representatives of the Company were taking the bargaining position was that ESI was not obligated to negotiate at all.

41.    After further unproductive meetings, during which ESI refused to negotiate, Anthem filed a breach of contract action against ESI on March 21, 2016, seeking $13 billion in pricing concessions over the remaining term of the Agreement, $1.8 billion in pricing adjustments after the end of the Agreement's term, $150 million in damages for ESI's operational breaches, and the ability to terminate its contract with ESI in a case styled *Anthem, Inc. v. Express Scripts, Inc.*, Case No. 1:16-cv-02048-ER (S.D.N.Y. March 21, 2016) (the "Anthem Action").  ESI responded with counterclaims of its own, alleging that it was Anthem, instead, that has breached the Agreement.

42.     At the same time, ███████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████

43.     As a result of the Individual Defendants' improprieties, Express Scripts disseminated improper, public statements that omitted or failed to disclose not only that the Agreement was unlikely to be renewed beyond 2019, but that the Agreement was subject to early termination, and/or misrepresented the true state of the Company's relationship with Anthem. These improper statements and omissions have devastated Express Scripts' credibility within the business community and capital markets.

44.     As a result of these misstatements and omissions, the Company has been subject to a suit for violations of the securities laws, captioned *In re Express Scripts Holdings Co. Sec. Litig.*, 16-cv-03338 (S.D.N.Y. May 4, 2016) (the "Securities Action").  Moreover, the actions leading to Anthem filing suit also led to Anthem's customers filing an ERISA action against ESI for them being directly overcharged as a result of the inflated prices in a case styled *In re Express Scripts/Anthem ERISA Litig.*, Case No. 1:16-cv-3399-ER (S.D.N.Y. May 6, 2016) (the "ERISA Action").

45.     In addition, between February 2015 and April 2016, the Individual Defendants caused the Company to repurchase millions of shares of Company stock through an Accelerated Repurchase Program.  Due to Express Scripts' officers and directors' omissions and affirmative misrepresentations, the per share price of these purchases was artificially inflated at the time of

these purchases.  This misconduct led not only to millions of dollars in corporate waste, but also gives rise to derivative claims for violations of the securities laws.

## JURISDICTION AND VENUE

46.    Pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, this Court has jurisdiction over the claims asserted herein for violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.  This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. § 1367.

47.    This Court has jurisdiction over each defendant herein because each defendant is either a corporation that conducts business in and maintains operations in this District, is a citizen of Missouri, or is an individual with sufficient minimum contacts with this District so as to render the exercise of jurisdiction permissible under traditional notions of fair play and substantial justice.

48.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Express Scripts maintains its principal place of business in this District, one or more of the defendants resides in or maintains executive offices in this District, a substantial portion of the transactions complained of herein took occurred in this District, and Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

### A.    Plaintiff

49.    Plaintiff Elow is a current Express Scripts stockholder and continuously has been a stockholder since at least April 2012.

**B.     Nominal Defendant**

50.     Nominal Defendant Express Scripts Holding Company is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at One Express Way, St. Louis, Missouri, 63121.  Express Scripts began as ESI, founded in the 1980s. ESI provides PBM services and clinic healthcare account administration services in North America.

51.     On July 20, 2011, ESI entered into a definitive merger agreement with Medco, which was amended by Amendment No. 1 thereto on November 7, 2011, providing for the combination of ESI and Medco under a new holding company named Aristotle Holding, Inc. The Merger was consummated on April 2, 2012.

52.     Aristotle Holding, Inc. was renamed Express Scripts Holding Company concurrently with the consummation of the Merger.  After the Merger between ESI and Medco was consummated on April 2, 2012, ESI became a wholly-owned subsidiary of Express Scripts and all outstanding shares of Medco were converted to Express Scripts stock.

53.     Today, Express Scripts is a holding company that operates through its subsidiaries, including wholly-owned ESI and Medco.

54.     The stock of Express Scripts trades on NASDAQ under the symbol ESRX.

**C.     Individual Defendants**

55.     Defendant Paz was elected a director of Express Scripts in January 2004 and has served as Chairman of the Board since May 2006.[3]  For fiscal year 2014, in exchange for his purported trust, loyalty, and fidelity to Express Scripts, Paz received $12,921,006 in total compensation, including salary, bonus, and option awards.  For fiscal year 2015, he received

---

[3] In this Section describing the Individual Defendants, the term "Express Scripts" refers to ESI prior to the Merger as well as Express Scripts Holding Company.

$14,835,587, and for fiscal year 2016, $11,916,801.[4]  Paz joined Express Scripts in 1998 as Senior Vice President and Chief Financial Officer ("CFO") and became President in 2003.  In 2005 he was named Express Scripts' CEO and the following year was elected Chairman of the Board.  While he remains Chairman, Paz retired from his role as CEO in May 2016.

56.    Defendant Timothy Wentworth ("Wentworth") was elected a director of Express Scripts in June 2015.  Wentworth was named as President of Express Scripts in 2014 and CEO in 2016.  Wentworth joined Express Scripts when it merged with Medco in April 2012.  At Medco, he led the employer and key accounts organizations for nearly 14 years.  He also served as CEO of Medco's Accredo Health Group subsidiary.  At Express Scripts, Wentworth is responsible for all aspects of the Company's strategic direction and core business, including sales and account management, information technology, operations, research and new solutions, and supply chain management.  For fiscal year 2014, in exchange for his purported trust, loyalty, and fidelity to Express Scripts, Wentworth received $7,286.202 in total compensation, including salary, bonus, and option awards.  For fiscal year 2015, he received $8,464,903, for fiscal year 2016, he received $14,522,178, and for fiscal year 2017, he received $15,895,415.

57.    Defendant Eric Slusser ("Slusser") served as Express Scripts' CFO from September 2015 to October 2017.  For September through December of fiscal year 2015, in exchange for his purported trust, loyalty, and fidelity to Express Scripts, Slusser received $1,611,409 in total compensation, including salary, bonus, and option awards.  For fiscal year 2016, he received $4,517,470, and for fiscal year 2017, $4,312,645.

58.    Defendant James M. Havel ("Havel") served as Express Scripts' Executive Vice President and was its Interim CFO from January to September 2015.  In September 2015, Havel

---

[4] In 2016, Paz was only an officer of Express Scripts through the month of June.

became the Company's Executive Vice President of Finance, but he left the Company in March 2016. Following Slusser's departure from Express Scripts in October 2017, Havel returned to Express Scripts and became the Company's permanent CFO. For fiscal year 2015, in exchange for his purported trust, loyalty, and fidelity to Express Scripts, Havel received $7,214,885 in total compensation, including salary, bonus, and option awards, and for fiscal year 2017, $3,870,429.

59. Defendant David Queller ("Queller") joined Express Scripts in July 2014 as the Senior Vice President, Sales and Account Management. Queller is responsible for the leadership, strategic direction and oversight of Express Scripts' full portfolio of business divisions. Prior to joining Express Scripts, Queller was Senior Vice President, National Accounts for Aetna, where he served for 14 years. For fiscal year 2016, in exchange for his purported trust, loyalty, and fidelity to Express Scripts, Queller received $3,360,109 in total compensation, including salary, bonus, and option awards, and for fiscal year 2017, he received $3,382,515.

60. Defendant Christopher A. McGinnis ("McGinnis") joined Express Scripts in 2008. He served as the Company's Vice President, Chief Accounting Officer ("CAO"), and Controller from September 2015 until June 2017. Prior to that, he served as Vice President of Finance and Investor Relations (August 2014 – August 2015), Vice President, Legal and Business Development (April 2012 – July 2014), and as Assistant General Counsel (April 2010 – April 2012). Prior to joining Express Scripts, McGinnis held various accounting, finance, legal, and business development roles.

61. Defendant Christopher K. Knibb ("Knibb") served as Express Scripts' Senior Vice President of Financial Planning and Analysis from September 2015 to July 2016. In that role, Knibb was responsible for entity-wide financial planning and analysis including strategic

planning, budgeting, forecasting, and internal/Board/investor reporting.  Prior to that, Knibb was Express Scripts' CAO from February 2013 to September 2015.

62.    Defendant Gary G. Benanav ("Benanav") served as a director of Express Scripts from January 2000 to May 2016.  In the relevant time period, Benanav served on the Board's Compliance Committee and Corporate Governance Committee.

63.    Defendant Maura C. Breen ("Breen") was elected a director of Express Scripts in July 2004.  Breen serves as Chair of the Board's Compensation Committee.

64.    Defendant William J. DeLaney ("DeLaney") was elected a director of Express Scripts in September 2011.   DeLaney is a member of the Board's Audit Committee and the Corporate Governance Committee.

65.    Defendant Elder Granger, MD, MG, USA ("Granger") was elected a director of Express Scripts in May 2015.  Granger is a member of the Board's Compliance Committee.

66.    Defendant Nicholas J. LaHowchic ("LaHowchic") was elected a director of Express Scripts in July 2001.  LaHowchic is a member of the Board's Audit Committee and Compensation Committee.

67.    Defendant Thomas P. Mac Mahon ("Mac Mahon") was elected a director of Express Scripts in March 2001 and has served as the Board's "Lead Independent Director" since May 2008.  Mac Mahon serves as Chair of the Board's Corporate Governance Committee.

68.    Defendant Frank Mergenthaler ("Mergenthaler") was elected a director of Express Scripts in January 2009.  Mergenthaler serves as Chair of the Board's Audit Committee.

69.    Defendant Woodrow A. Myers, Jr., MD ("Myers") was elected a director of Express Scripts in May 2007.  Myers is a member of the Board's Compensation Committee and Compliance Committee.

70.     Defendant Roderick A. Palmore ("Palmore") was elected a director of Express Scripts in September 2014.   Palmore is a member of the Board's Corporate Governance Committee.

71.     Defendant William L. Roper, MD, MPH ("Roper") was elected a director of Express Scripts in April 2012, and served as a director of Medco Health Solutions, from December 2007 until the Company merged with Medco in April 2012.  Roper serves as Chair of the Board's Compliance Committee.

72.     Defendant Seymour Sternberg ("Sternberg") was elected a director of Express Scripts in March 1992.  Sternberg is a member of the Board's Audit Committee and Corporate Governance Committee.

73.     The named Defendants in paragraphs 55 through 72 are collectively referred to herein as the "Individual Defendants."

74.     Defendants DeLaney, LaHowchic, Mergenthaler, and Sternberg are collectively referred to herein as the "Audit Committee Defendants."

**D.     Non-Defendant Director**

75.     Kathleen M. Mazzarella ("Mazzarella") is a member of the Board as of the date of this Complaint but is not named as a Defendant because she did not participate in any of the wrongdoing alleged herein.

## GENERAL FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

76.     The Individual Defendants have and had stringent fiduciary obligations to Express Scripts and its stockholders.

77.     By reason of their positions as directors, officers, and/or fiduciaries of Express Scripts and because of their ability to control its business and corporate affairs, the Individual Defendants owe and owed Express Scripts and its stockholders fiduciary obligations of loyalty,

good faith, due care, disclosure, candor, and oversight, and were and are required to use their utmost ability to control and manage Express Scripts in a fair, just, honest and equitable manner. The Individual Defendants are and were required to act in furtherance of the best interests of Express Scripts and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interests or benefit.

78.     Each director and officer of the Company owes to Express Scripts and its stockholders the fiduciary duty to exercise good faith, loyalty, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and to uphold the highest obligations of fair dealing.  In addition, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the relationship between the Company and its largest commercial client.

79.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Express Scripts, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.  Because of their advisory, executive, managerial, and directorial positions with Express Scripts, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of Express Scripts.

80.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Express Scripts and was at all times acting within the course and scope of such agency.

81.     To discharge their duties, the officers and directors of Express Scripts were required to exercise reasonable and prudent supervision over the management, policies,

practices, and controls of the financial affairs of the Company.  By virtue of such duties, the

officers and directors of Express Scripts were required to, among other things:

>    a. conduct the affairs of the Company in an efficient, businesslike manner, so
>       as to make it possible to provide the highest quality performance of its
>       business, ensure that the Company fulfills its contractual duties, to avoid
>       wasting the Company's assets, and to maximize the Company's value;
>
>    b. properly and accurately guide stockholders and analysts as to the true
>       financial condition of the Company at all times, including making accurate
>       statements about the Company's relationship with its largest client, and
>       ensuring that the Company maintained an adequate system of financial
>       controls such that the Company's accounting and financial reporting
>       would be true and accurate at all times;
>
>    c. ensure that the Company's revenue projections and amortization of costs
>       were based on appropriate support and documentation, and were routinely
>       checked for accuracy;
>
>    d. ensure that the Company was operated in a diligent, honest and prudent
>       manner in compliance with all applicable federal, state and local laws,
>       rules and regulations;
>
>    e. ensure that there were sufficient checks and balances in Express Scripts'
>       accounting and finance functions, and related functions, to prevent
>       accounting irregularities, internal control problems, and/or overstatement
>       of income, revenues and cash flow; and
>
>    f. ensure that no inaccurate financial information about Express Scripts was
>       released to the public that would tend to artificially inflate Express
>       Scripts' stock, and that would thus cause corresponding or greater harm to
>       the Company's value when the truth was revealed.

82.    The conduct of the Individual Defendants complained of herein involves a

knowing and culpable violation of their obligations as directors and officers of Express Scripts,

the absence of good faith on their part, and a reckless disregard for their duties to the Company

and its stockholders.  The Individual Defendants were aware, or should have been aware, that

those violations, absences of good faith, and the reckless disregard of duties posed a risk of

serious injury to the Company.  The conduct of the Individual Defendants, who were also

officers and/or directors of the Company, has been ratified by the remaining Individual Defendants who collectively comprised Express Scripts' Board.

83.     Because of their positions with the Company, and their access to material non-public information available to them but not to the public, Express Scripts, through the Individual Defendants, knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading.  As a result of the Individual Defendants' illegal actions and course of conduct, the Company is, among other things, now subject to multiple stockholder, ERISA, breach of contract, and derivative lawsuits that allege violations of both federal and state law.  As a result, Express Scripts has expended, and will continue to expend, significant sums of money to defend against these lawsuits and faces the possibility of being assessed millions of dollars in damages.

## SPECIFIC FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

84.     According to the Company's Corporate Governance Guidelines, the Board's Role and Structure is described as:

> **A. General.**  The Company's business is conducted by its employees, managers and officers, under the direction of the Chief Executive Officer (CEO) and the oversight of the Board, to enhance the long-term value of the Company for its stockholders.  The Board is elected by the stockholders to oversee management and to help assure that the long-term interests of stockholders are being served. Both the Board and management recognize that the long-term interests of stockholders are advanced by responsibly addressing the concerns of other stakeholders and interested parties, including employees, recruits, customers, suppliers, communities, governmental bodies and the public at large.

> **B. Functions.**  In addition to general oversight of management, the Board, either directly or through on or more of its Committees, also performs a number of specific functions, including: (1) Selecting, evaluating and compensating the CEO and overseeing CEO succession planning; (2) Providing counsel and oversight on the selection, evaluation and development of senior management; (3) Reviewing, monitoring and, where appropriate, approving fundamental financial and business strategies and major corporate actions; (4) Overseeing management's assessment

of major risks facing the Company and options for mitigation; and (5) Ensuring processes are in place for maintaining the integrity of the Company, including the integrity of the financial statements, the integrity of compliance with law and ethics, the integrity of relationships with customers and suppliers, and the integrity of relationships with other stakeholders.

85.     The Corporate Governance Guidelines also set forth that "no less than a majority of the members of the Board of Directors shall qualify as independent directors in accordance with the applicable provisions of (a) the Securities Act of 1934, as amended, and the rules promulgated thereunder, and (b) the Nasdaq Global Select Issuer requirements for independent directors."



██████████████

████████████████████████████████

88.     In addition, the Audit Committee Defendants had further duties, as provided in the Company's Audit Committee Charter.  Pursuant to that document, the Audit Committee Defendants were required to review, discuss, and approve the Company's annual and quarterly financial statements to be filed with SEC.

89.     The Audit Committee Defendants were also charged with monitoring the Company's major financial risk exposures, its risk assessment, and risk management policies.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

90.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct.  They have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to pursuing the wrongful conduct that gives rise to their primary liability, the Individual Defendants also aided and abetted, and/or assisted, each other in breach of their respective duties.

91.     Individual Defendants collectively and individually initiated a course of conduct that was designed to and did conceal that Express Scripts' stock was materially and systematically overstated during the relevant period and caused or allowed ESI to violate its contract with its most important client.

92.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of state and federal law, including breaches of fiduciary duty, waste of

---

[6] ██████████

corporate assets and making untrue statements of or omitting material facts; and to conceal adverse information concerning the Company's relationship with Anthem, as well as future sales and continued growth.

93.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by purposefully or recklessly releasing improper statements on the Company's behalf.  Because the actions described herein occurred under the Board's authority, each of the Individual Defendants played a direct, necessary, and substantial part in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

94.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his overall contribution to and furtherance of the wrongdoing.

## SUBSTANTIVE ALLEGATIONS

### A.     ESI's Contract with Anthem

95.     Through its relationship with its wholly-owned subsidiary ESI, Anthem was Express Scripts' largest and most important customer, representing billions of dollars in annual revenue for Express Scripts.

96.     In 2009, ESI entered into the Agreement, as part of ESI's purchase of a number of Anthem subsidiaries.  As of 2015, the parties' relationship was governed by the Agreement as amended effective January 1, 2012, by and among Anthem on behalf of itself and its designated affiliates, and ESI, on behalf of itself and its subsidiaries and affiliates, as amended, Express Scripts, through ESI, was obligated to provide PBM services to Anthem's affiliated health plans.

22

97.    Section 3.1(a) of the Agreement requires that ESI perform services under the Agreement "in a prudent and expert manner in accordance with this Agreement and all Laws."[7]

98.    Section 5.6 of the Agreement contains a "Periodic Pricing Review" provision that states:

> [Anthem] or a third-party consultant retained by [Anthem] will conduct a market analysis every three (3) years during the Term of this Agreement to ensure that [Anthem] is receiving competitive benchmark pricing.  In the event [Anthem] or its third party consultant determines that such pricing terms are not competitive, [Anthem] shall have the ability to propose renegotiated pricing terms to [ESI] and [Anthem] and [ESI] agree[] to negotiate in good faith over the proposed new pricing terms.[8]

99.    Section 4.11 of Exhibit I to the Agreement states that ESI is "responsible for collecting, creating and submitting [prescription drug event ("PDE")] files to [Centers for Medicare & Medicaid Services ("CMS")] containing claims data as required by CMS in the format and timeframe as specified by CMS."[9]

100.    Section 4.11.3 of Exhibit I to the Agreement states that ESI is "responsible for receiving the PDE response files from CMS, processing the PDE response file, resolving any [ESI] owned errors, and resubmitting impacted records with resolved errors to CMS for acceptance with [a certain amount of time] of receipt."[10]

101.    Section 4.11.7 of Exhibit I to the Agreement states that where ESI "is made aware of Member overpayment due to incorrect Cost Share, [ESI] shall promptly refund the amount of the overpayment to the Covered Individual or the Covered Individual's designee."[11]

---

[7] *See* Complaint at ¶17, Anthem Action (Dkt. 1) (hereinafter "Anthem Complaint"), submitted herewith as Exhibit B.

[8] Anthem Complaint ¶15.

[9] Anthem Complaint ¶61.

[10] *Id*.

[11] *Id*.

102.    Section 4.11.9 of Exhibit I to the Agreement requires that ESI ensure that PDE systems and processes are designed, modified, and tested well in advance of the effective date of changes initiated by CMS or ESI.[12]

103.    In Section 7.2 of Exhibit I to the Agreement, Anthem delegated to ESI its responsibility under its Medicare Part D contract with CMS to provide the services set forth in the Agreement to Medicare Part D Covered Individuals.[13]  This section states that Anthem "may revoke this delegation, including, if applicable, the delegated responsibility to meet CMS reporting requirements, and thereby terminate the Agreement if CMS or [Anthem] determines that [ESI] has not performed satisfactorily."[14]

104.    Section 6.2 (a) of the Agreement allows either party to terminate the Agreement, if there is a material breach of a contractual term, and there is no cure within a defined period of time.

105.    Section 16.5 of the Agreement provides that "[n]either party shall exercise any termination right under Section 6.2(a)" unless the parties engage in a three-step dispute resolution process.  The first step is the JPOC meeting, the second step is a meeting of the parties' presidents, and the third step is mediation. [15]

**B.    Express Scripts' Amortization of the Agreement**

106.    Under GAAP, Express Scripts was obligated to provide accurate estimates of the useful life of intangible assets, which includes the Agreement.

---

[12] *Id*.

[13] *Id.* ¶83.

[14] *Id*.

[15] *Id.* ¶114; *see also* Answer and Amended Counterclaims ¶135, Anthem Action (Dkt. 33) (hereinafter "ESI Answer"), submitted herewith as Exhibit C.

107.   ASC 350[16] *Intangibles – Goodwill and Other* provides that for contracts, such as the Agreement, "[t]he accounting for a recognized intangible asset is based on its useful life to the reporting entity."   Thus, Express Scripts was required to allocate the diminution in the Agreement over the course of the Agreement's useful life, defined as "the period over which the asset is expected to contribute directly or indirectly to the future cash flows of that entity."

108.   When ESI entered the 10-year Agreement in 2009, it amortized the costs of the customer contracts and relationships related to that contract over a 15-year period.  After the Merger, Express Scripts continued to use the 15-year period in its amortization.  In other words, Express Scripts was representing to its investors that it had sufficient basis to believe that the contract would be renewed beyond the 2019 scheduled expiration.

109.   In April 2010, the SEC asked Express Scripts to explain why it was utilizing a 15-year amortization for the Agreement.  Specifically, the SEC asked Express Scripts to "[c]larify why [the Agreement] is being amortized using a 'pattern of benefit method' over 15 years of which a greater portion of the expense is being recorded in the first five years."  The SEC asked Express Scripts to justify "why a 15-year life is appropriate considering the contractual term is 10 years."

110.   In response, Express Scripts advised the SEC:

> In determining the useful life for the 10-year contract with [Anthem], we assumed *__a high probability that the contract with [Anthem] would be renewed for a second term after the 10-year contract expired.__*  This assumption is based on industry renewal rates, *the Company's embedded relationship with [Anthem]*, and potentially significant efforts around the ability to change PBM providers.  ***We have no reason to believe that a***

---

[16] ASC stands for the "Accounting Standards Codification" and is a codification of the official accounting standards required by the SEC.

*future [Anthem] contract renewal will differ materially from this historical experience.*[17]

111.    The SEC sought clarification and requested that Express Scripts "[c]onfirm to us that the 15-year life you use to amortize the $1,585 million intangible asset is the same as the length of time expected to generate cash flows from the agreement that you used to value this intangible asset."

112.    Express Scripts responded that "a probability-adjusted methodology was used to determine that a 15-year pattern of benefit amortization period represents the most probable life, taking into account customer renewals."

113.    According to PricewaterhouseCoopers LLP, Express Scripts' outside audit firm, an event is only considered "probable" if it has "a 75-80% likelihood" of occurring.

114.    Pursuant to GAAP, if at any time Express Scripts became aware that there was no longer a supportable basis to conclude that the contract with Anthem had a useful life beyond 2019 (and thus no basis to amortize the contract at a greater than 10-year time frame), Express Scripts was required to revise the contract's amortization accordingly.

**C.    ESI's Operational Breaches and the Repricing Dispute.**

**1.    Anthem Alleges that ESI Failed to Perform in a Prudent and Expert Manner**

115.    On February 16, 2015, Anthem sent ESI a notice of default, detailing numerous operation breaches of the Agreement, including ESI's failure to perform the required services under the Agreement "in a prudent and expert manner" as the Agreement required.

---

[17] All emphasis is added herein.

116.    The February 16, 2015 notice of default stated that Anthem would terminate the Agreement if the breaches were not cured and asserted that Anthem had the right to terminate the Agreement in accordance with Section 7.2 of Exhibit I of the Agreement.

117.    As alleged in the Anthem Action, numerous ESI deficiencies existed for quite some time preceding the formal notice of default in February 2015 and continued thereafter after Express Scripts failed to cure the operational breaches, leading to the filing of the Anthem Action.  For instance, to service Anthem's clients, ESI deployed a joint database known as the WellPoint RX Issues Tracking System, or WRIT, which was designed to identify problems with ESI's performance of PBM services for Anthem.[18]  Between mid-April and the end of 2015, Anthem raised 156 new issues related to ESI's performance of PBM services for Anthem's customers.[19]

118.    In another example, on September 1, 2013, ESI implemented a new computer software program, called "C360," as part of a larger new system known as "Foundation 14" for a portion of Anthem's business.[20]  On January 1, 2014, ESI implemented C360 for the remainder of Anthem's business.[21]  Since January 2014, ESI has acknowledged the need to correct functionality in C360 so that ESI's computer system could correctly identify defined criteria for the ESI employee reviewing the request—functionality that had existed before ESI's defective implementation of C360.  ESI failed to correct the defects amid repeated requests from Anthem for over two years prior to the filing of the Anthem Action.[22]

---

[18] Anthem Complaint ¶80.

[19] *Id.* ¶82.

[20] *Id.* ¶55; ESI Answer ¶76.

[21] Anthem Complaint ¶55; ESI Answer ¶76.

[22] Anthem Complaint ¶58.

119.    Further, Anthem also identified a design defect known as "Super PA" which led to drug claims being incorrectly approved by ESI.  Super PA caused Anthem damages in excess of $58 million.[23]  Even after receiving formal notice of a breach of contract related to Super PA, ESI failed to cure the SPA breach for nearly a year.[24]

### 2. Anthem Notifies ESI that it would seek $15 Billion in Pricing Adjustments

120.    Under the parties' original 2009 contract, the benchmark adjustment for drug pricing was to take place every three years.  The first price check in 2012 took nearly a year to complete.  Although ESI and Anthem agreed to make pricing adjustments, the process left the relationship between them strained.  ESI disclosed in an SEC filing that it and Anthem were "involved in a contractual dispute regarding certain terms of the [] Agreement," and that Anthem "ha[d] raised the possibility of litigation" to resolve the dispute.[25]

121.    The second benchmark adjustment was scheduled to occur in 2015.  Given how long the negotiations took for the 2012 adjustment, Anthem began negotiations in late 2014.  On October 17, 2014, Anthem sought $13 billion in pricing concessions over the remaining four-year term of the contract, as well as $1.8 billion in post-termination pricing concessions.

122.    It was ESI's view, however, that the Agreement did not require ESI to provide "competitive benchmark pricing."  As ESI stated in the Anthem Action, "From the outset of negotiations in October 2014 … Anthem took positions regarding the parties' rights and obligations—including but not limited to Anthem's erroneous claim that ESI is obligated to

---

[23] *Id.* ¶¶78-79.

[24] *Id.*

[25] Form 8-K filed with the SEC on December 13, 2011.

provide Anthem with 'competitive benchmark pricing'—that were inconsistent with the plain terms of the [] Agreement."[26]

### 3.   The February 23, 2015 10-K and the February 25, 2015 Earnings Call

123.   On February 23, 2015, just seven days after receiving a notice of default from Anthem, representatives of Express Scripts filed a Form 10-K for the year ending December 31, 2014 on the Company's behalf.[27]   As set forth in prior 10-Ks, this 10-K disclosed that the Agreement continued to be amortized over a 15-year period, representing to investors that Company insiders concluded that there remained a "high probability" that the Company's relationship with Anthem would continue beyond 2019.

124.   On February 25, 2015, Defendants Paz, Wentworth, Queller, and Havel held an investor conference call with analysts.   During that call, one analyst sought an update on the Company's relationship with Anthem.   Defendant Queller responded:

> [W]e've got a great relationship with Anthem.   We're right now working with them very closely to help them prepare for their 1/1/16 business …. Our teams work closely together each and every day. ***The relationship is very, very solid***.   I know they've made mention in Investor Days about contract negotiations, things of that nature …. I can tell you that we're helping them roll out new states … ***and it's business as usual***.   And we look forward to having them as a client through the end of the contract term which is at the end of 2019 and we'd love to have them for a longer time as well.   But we'll continue to work with them very, very closely just as we always do to make them successful.

125.   The 10-K and the subsequent conference call gave no hint that the relationship between Express Scripts and Anthem had, in fact, begun unravelling.   The Individual Defendants, however, were beginning to get a clear picture that the "very solid" relationship may be anything but.

---

[26] ESI Answer ¶6.

[27] This 10-K was signed by Defendants Paz, Havel, Knibb, Benanav, Breen, DeLaney, LaHowchic, Mac Mahon, Mergenthaler, Myers, Palmore, Roper, and Sternberg.

**4.** ██████████████████████████████████

126.   ███████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

████████████████████████████████████

127.   One day after Queller's comments, Defendants Paz and Wentworth sent a memorandum to the ESI board of directors, which was provided to the Express Scripts' Board at its March 4, 2015 meeting (described below).

128.   ███████████████████████████



129.   ███████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

██████████████████████████████████████

130.   ███████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████



131.

132.

133.

was claiming there were severe and material operational breaches warranting contract cancellation, was "not pleased," required "greater focus" from the Company, and had invoked the contract's dispute resolution process.



136.    On March 4, 2015, the full Board received a presentation from Defendant Queller and Matt Totterdale ("Totterdale"), Vice President and Anthem Division General Manager of the Company.   Defendants Benanav, DeLaney, LaHowchic, Mac Mahon, Mergenthaler, Myers, Palmore, Paz, and Sternberg participated in this meeting as Board members.   Defendants Wentworth and Havel also attended.[32]

---

[31] ████████████████████████████████████████████████████

[32] ████████████████████████████████████████████████████

137. 

138.

139.

140.     Two days later, in accordance with Section 16.5 of the Agreement, the first step in the termination process took place.  The JPOC met in an effort to resolve the dispute alleged in Anthem's February 16, 2015 letter.  The meeting was unsuccessful.

### 6.  The Operational Breaches Continue

141.     ESI continued to demonstrate an inability to service Anthem's account.  Between April 17, 2015 and December 31, 2015, the companies' joint database designed to track ESI's PBM services for Anthem reported 156 new and unresolved issues.

142.     On May 21, 2015, Anthem reported to Centers for Medicare and Medicaid Services ("CMS") that ESI did not have an automated process for paper claims in place and that what process is did have lacked adequate internal controls and could fail in various ways.

143.     On June 10, 2015, Anthem reported to CMS that an ESI system error led to 37,524 Part D members paying higher co-payments than they should have paid for certain drugs.[36]

144.     On August 3, 2015, Anthem reported to CMS that an ESI error led to the rejection at the point of sale of claims for nearly 1,500 Medicare members.[37]

145.     In October 2015, ESI erroneously removed 53,000 Part D members due to the adjustments made in June 2015, which resulted in thousands of further adjustments to the cost sharing amounts they had paid.  Anthem notified CMS of this additional issue on October 15, 2015.[38]

146.     From January 1, 2016 through February 3, 2016, hundreds of thousands of prescribers' claims were rejected due to problems with ESI's taxonomy codes in the National

---

[36] Anthem Complaint ¶87.

[37] *Id*.

[38] *Id*.

Provider Identifier database.  Anthem notified CMS of these issues on January 1, 2016, February 2, 2016, and February 8, 2016.[39]

### 7.  Meanwhile, the Pricing Negotiations Continue

147.    ██████████████████████ on March 18, 2015, ESI received formal notification from Anthem that it had conducted a market analysis with the aid of a third-party consultant, pursuant to Section 5.6 of the Agreement, and determined that ESI was not charging competitive prices.  As a result of its third-party market check, Anthem demanded $13 billion in pricing concessions over the remaining four years of the Agreement, plus an additional $1.8 billion in post-termination pricing concessions.  Anthem requested that ESI provide, by March 30, 2015: (a) confirmation that the new pricing terms proposed by Anthem constituted competitive market pricing, or (b) alternative pricing terms for benchmark pricing.

148.    On April 1, 2015, after ESI declined to engage in any pricing negotiations at all, Anthem sent a second formal notice of breach, this time related to Express Scripts' failure to negotiate repricing under Section 6.2 of the Agreement.  Pursuant to the Section 6.2(a) of the Agreement, ESI had 60 days to cure this breach.

149.    On April 29, 2015, Defendants Paz, Wentworth, and Havel, participated in an earnings conference call.  During that call, an analyst asked: "Can you please talk about your relationship with Anthem? I'm sure you guys have a good relationship with them."

150.    These Defendants did not inform analysts and the investing public that the Company had received two formal notices of contract breach, ██████████████████ ████████████████████████████ that representatives of the Company had refused to negotiate with Anthem, that Anthem was "not pleased" with ESI's services, and ██

---

[39] *Id.*

████████████████████████████████████████████████████████████

████████████████████

151.    Instead, Defendant Paz stated "Anthem is an incredibly important client to us. And I think we do very good things together.  So we really enjoy that relationship.  We really enjoy providing services to their members ….  So I do think it is a two-way street."

152.    Indeed, ████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████ the Company's ████ 10-Q ██████████████████ dated April 28, 2015 ████████████████████████████████████████ other than boilerplates disclosures that the Company faced potential risks from its "failure to execute on, or other issues arising under, certain key client contracts."[40]

153.    Moreover, despite its imperiled relationship with Anthem, the Individual Defendants continued to cause the Company to amortize the Agreement over a 15-year period, representing to the Company's investors that not only did it believe that the Company's contract with Anthem was not likely not to be cancelled, but that it was probable that the contract would be renewed following its expiration in 2019.

**8.**    ████████████████████████████████████████████████

154.    ████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████[41]

---

[40] This Form 10-Q was signed by Defendants Paz and Havel.

[41] ████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

155. ███████████████████████████████████

███████████████████████████████████████

████████████████████████ [42]

156. ███████████████████████████████████

███████████████████████████████████████

████████████████████████ [43]

157. ███████████████████████████████████

███████████████████████████████████████

██████████████ ████ [44] ███████████████████████

█████████████████████████████████████████ [45]

158. ███████████████████████████████████

████████████████████████████████



███████████████████████████████████████████

████ [42] ██████

[43] █████████████████████████████████████
████████████████████████

[44] ██████████████████████████████████████████
████████

[45] Swedish, Anthem's CEO, had previously announced that Griffin would be Anthem's point person in the pricing negotiations with Express Scripts.



159. ███████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████[47] █████████████████████████████████████

████████████████████████████████████[48]

160. ███████████████████████████████████

███████[49] ████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████ Anthem's

position was that the Agreement did not require contract extension as a prerequisite for repricing

negotiation.

161. ███████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

[46] ███████████████████

[47] █████████████████████████████████████████████

[48] ███████████████████

[49] ██

███████████████████████████████████████

████████████████████  ████████████████████

█████████████████████

### 9.  The May 8, 2015 Morgan Stanley Conference Call

162.   On May 8, 2015, shortly after the Board meeting at which the participants discussed the severe and significant problems with the rapidly deteriorating Anthem relationship, Defendants Paz, Wentworth, and Havel painted a different picture during a conference call with Morgan Stanley, as part of the "CEO/CFO conference series."

163.   As Morgan Stanley explained in an analyst report following the call, Express Scripts' "[m]anagement continues to view a strong relationship with Anthem … just over the halfway point of the original contract term, which goes to 2019."

### 10. The Pricing Negotiations Fail to Make Headway

164.   On May 27, 2015, the meeting of ESI's and Anthem's presidents—Defendant Wentworth and Griffin, respectively, the second step in the contract cancellation process, took place.[50]

165.   This meeting failed to resolve the contract dispute.  ████████████████



---

[50] █████████████████████████████

[51] ██████████████████████████████████████

166. 

167.    On June 22, 2015, long after the 60-day cure period had come and gone, ESI formally responded to Anthem's April 1, 2015 notice of breach with regard to the pricing dispute, as well as Anthem's March 18, 2015 demand in pricing concessions.

168.    As described by Anthem, "ESI did not dispute that Anthem's proposal constituted competitive benchmark pricing.  Nonetheless, ESI rejected, and refused to negotiate over, Anthem's pricing terms.  Moreover, ESI failed to make any proposal for competitive benchmark pricing, as Anthem requested."[53]

169.    Express Scripts' story differs.  It contends that ESI made a counter-proposal offering "substantial pricing concessions that were well within the range of what Anthem publicly told the market it expected to receive" but further revealed that the "counter-proposal also offered Anthem billions of dollars in additional value if Anthem modernized its outdated benefit plans in line with prevailing industry trends."[54]  So, even according to ESI's account, conditions were put on its counter-proposal to Anthem.

---

[53] Anthem Complaint ¶27.

[54] ESI Answer ¶9.

170.    Despite these different accounts of what occurred in mid-2015, one thing is absolutely clear.  The parties had not even begun to negotiate, and the prospect for a continuation of the parties' relationship to 2019 was doubtful, let alone an extension beyond 2019.  Nevertheless, Express Scripts continued to represent to the public that it was probable that the Agreement would likely be extended.

171.    

172.    Anthem announced on July 24, 2015, that it intended to acquire Cigna for $54.2 billion.  During a conference call to discuss the acquisition, Anthem emphasized that one of the advantages of the acquisition was that it gave Anthem the ability to make "some key decisions" related to its contract with ESI, and that the timing of the Cigna acquisition "couldn't be better for us related to our Express Scripts agreement coming to a close in 2019."

173.    



174.    Two days after receiving notice that Anthem was invoking the final step in the contract cancellation process, on July 29, 2015, Defendants Paz, Havel, and Wentworth participated in a call with investors and analysts.

175.    During the call, Defendant Wentworth informed investors that the Company's "performance to date and the positive feedback we continue to receive gives us confidence that we have strong retention across the board."  Defendant Wentworth continued, and explained that the Company's "business outlook remains strong and our momentum continues."

176.    ████████████████████████████████████████████████████████████████████████████████████

**11. Defendant Paz Resigns as CEO, and the Anthem Impasse Continues**

177.    On September 9, 2015, it was announced that Defendant Paz would resign as the Company's CEO, effective May 2016, but would remain as the Company's non-executive Board Chairman.  Further, it was disclosed that Defendant Wentworth would succeed Defendant Paz as the Company's CEO.



██████████████████████████████████████████████

██████ [58]

179.  ████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████ [59] ████████████████████

████████████████████████████████████

180.  ███████████████  the Company executives' negotiations with Anthem continued to go nowhere.  On September 15, 2015, representatives of Anthem and ESI met again.  And, again, the parties failed to resolve their dispute.

181.  ESI and Anthem were at an impasse.  On October 2, 2015, ESI reiterated that it would not negotiate the Agreement's pricing terms.  On October 8, 2015, Anthem reiterated that ESI was obligated to do so.

182.  ████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████

183.  On November 5, 2015, Anthem requested a further meeting with ESI, a request ESI declined.[60]

_____

[58] ██████████████████████████████████████████████

[59] ████████████████████████████

[60] Anthem Complaint ¶33; ESI Answer ¶54.

184.    On November 9, 2015 the parties met for their scheduled mediation. █

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████[61]

185.    ████████████████████████████████████████████████

████████████████████





186.    Thus, by November 10, 2015 negotiations still had not progressed beyond ESI's initial bargaining stance, and the parties were still at an impasse.   At this juncture, Express Scripts' directors and officers were under a duty to disclose in its public filings that the negotiations "involved in a contractual dispute regarding certain terms of the [] Agreement" and that litigation was possible, as was disclosed to the investing public in 2011 when the parties were negotiating the 2012 price concessions.   Express Scripts' directors and officers did not do so, however.

187.    On November 11, 2015, Anthem directly contacted Wentworth, and reiterated its demand for a meeting to negotiate competitive benchmark pricing pursuant to the Agreement. But ESI refused to meet or negotiate.[63]   Further requests by Anthem for meetings to negotiate followed, including requests made on November 23, 2015 and December 2, 2015.[64]

188.    ESI still refused to negotiate competitive benchmark pricing, and Anthem still insisted that ESI was obligated to do so pursuant to the terms in Section 5.6 of the Agreement. Indeed, Anthem provided ESI with a revised pricing proposal on December 2, 2015, stating:

> Attached please find a revised proposal for competitive benchmark pricing pursuant to Section 5.6 of the Agreement.  As you know on 3/18/2015 Anthem proposed pricing terms based on a market analysis of competitive benchmark pricing conducted by it and a third-party consultant, Health Strategies, LLC, which determined that the current pricing terms of the Agreement were not even close to competitive.  Months have elapsed, but ESI has refused to negotiate for competitive pricing, as required under Section 5.6 of the Agreement.  Given the lapse of time, Health Strategies has now updated its analysis, and has determined that competitive benchmark pricing has decreased since 3/18/2015. Nonetheless, in the hopes of getting ESI to engage in meaningful negotiations, our revised proposal provides for pricing that is higher than as originally proposed and, therefore, favors ESI. We remain available to discuss pricing with ESI. Please let me know when you are available to meet. We look forward to a favorable consideration of this revised proposal.[65]

---

[63] Anthem Complaint ¶34; ESI Answer ¶55.

[64] Anthem Complaint ¶¶35-36; ESI Answer ¶¶56-57.

[65] Anthem Complaint ¶36; ESI Answer ¶57.

189. 

190.

191.    On December 14, 2015, Anthem sent an email to Wentworth asking whether ESI:

- "was willing to reconsider its position that it is not required to offer Anthem competitive benchmark pricing?"

- "willing to reconsider its position that it has the right to veto competitive benchmark pricing to Anthem?"

- "agreed to provide, or offered to provide, pricing terms to any other customer or potential customer on terms consistent with those that Anthem is requesting?"[67]

In this email, Anthem also requested a "meeting among the decision-makers."[68]

192.    On December 15, 2015, ESI finally responded—taking the same position as it had in every exchange during pricing discussions with Anthem since March 2015—asserting that it

---

[66] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[67] Anthem Complaint ¶37; ESI Answer ¶58.

[68] Anthem Complaint ¶37; ESI Answer ¶58.

was under no obligation to negotiate drug pricing with Anthem.[69]   ESI stated that it would respond to the pricing proposal within two weeks, but refused the request for a meeting.[70]

193.    Two days later, Anthem wrote back, requesting that ESI respond sooner, stating that ESI "already had nine months to consider the pricing issue and certainly must know its intentions."[71]   Anthem requested that ESI respond to the revised pricing proposal it made in the December 2, 2015 letter sooner than the promised two weeks.[72]

194.    At this juncture at the absolute latest (and most likely before), Express Scripts was obligated to inform the investing public that the Agreement was not only extremely unlikely to be renewed after 2019, but that the contract itself was in significant peril of early termination and the subject of litigation.

195.    Indeed, as previously noted, in an 8-K filed on December 11, 2011, Express Scripts (then ESI) made precisely the type of disclosure required during the parties' previous negotiations, informing investors that the Company and Anthem were "involved in a contractual dispute regarding certain terms of the [] Agreement," and Anthem "ha[d] raised the possibility of litigating to resolve these matters."

### 12. The December 22, 2015 Conference Call

196.    On December 22, 2015, Express Scripts' Vice President of Investor Relations, along with Defendants Slusser, Wentworth, Paz, held a conference call with analysts and investors to discuss the Company's prospects for 2016.

---

[69] Anthem Complaint ¶38.  This is incredible as ESI was aware it had the obligation to negotiate over the pricing terms in good faith.  ESI Answer ¶152.

[70] Anthem Complaint ¶38.

[71] *Id.* ¶39.

[72] Anthem Complaint ¶39; ESI Answer ¶60.

197.    Defendant Paz stated that ESI was "currently in discussions with Anthem regarding the periodic pricing provisions of the agreement."

198.    Defendant Paz also stated that "We previously engaged in this review process in 2012, and following several months of discussions, that process resulted in a mutually beneficial agreement between both Express Scripts and Anthem …. We are excited to continue productive discussions with Anthem regarding our relationship, and particularly the powerful savings they can achieve and pass along to their clients, under the range of cost savings programs we offer."

199.    Defendant Paz further stated "we are fully committed to reaching a mutually beneficial agreement and continuing our successful working relationship."

200.    During the call, an analyst asked, "[i]s an Anthem re-pricing considered in the 2016 guidance? And if not, can you quantify the earnings risk that could be related to the re-pricing." Instead of explaining the true state of affairs, including that the Anthem and ESI had been in contentious and unproductive negotiations *for over a year*, Defendant Paz stated that Anthem negotiations were still "very early on," explaining:

> It is our—it is the common practice in our book of business, across the industry, that when a client comes forward with a price check request, we sit down with that client to carefully examine those areas driving drug spend and identifying opportunities for saving. Specifically, we work closely with our clients to optimize their position in the market and drive savings through the use of the very powerful tools and cost savings programs, including formulary and network management and changes. These types of activities can be mutually beneficial, and help drive significant value to both parties, and all clients and members. We think there's a great deal of opportunity for Anthem to take advantage of a number of these programs, and we're excited about the opportunity they present for both companies.

201.    Defendant Paz's response to the analyst's question failed to tell the Company's investors that ESI and Anthem had gone through the three contract termination prerequisites, that the mediation had reached an impasse on the first day, and that Anthem and ESI had failed to agree on the basic premise of whether ESI was required to negotiate drug pricing. Defendants

Slusser and Wentworth said nothing to contradict Defendant Paz's statements or offer further explanation.

202.    Indeed, contrary to Defendant Paz's explanations, ESI and Anthem did not have a "successful working relationship," they were not "sit[ting] down" and were not "work[ing] closely."

203.    The very next day, ESI responded to Anthem's demand that ESI's response to Anthem's revised pricing proposal should be given sooner than December 29.  The response a non-response, however, merely notifying Anthem that ESI would provide a substantive response to Anthem at a later time.[73]

### 13. The Company's Executives Finally Respond to Anthem's Pricing Proposal

204.    Late in the evening of January 7, 2016, representatives of ESI finally responded to Anthem's pricing proposal, offering to lower pricing in the Agreement by only $1 billion, significantly lower than the $13 billion sought by Anthem.  Moreover, this figure was to be offset by increasing post-termination drug pricing by $1 billion and seeking an increase in Medicaid pricing.[74]

### 14. Anthem Discloses the Contract Dispute

205.    Anthem had had enough.  On January 12, 2016, Anthem's CEO Swedish, at J.P. Morgan's Healthcare Conference, told participants:

> I want to update you on the substantial savings capture we believe is available by improving pharmaceutical pricing, for which we are contractually entitled under our current agreement with ESI. . .. As you would expect from us, our management team has done a substantial amount of homework in evaluating the pharmaceutical marketplace to assess the value of our repricing provision to drive

---

[73] Anthem Complaint ¶40; ESI Answer ¶61.

[74] Anthem Complaint ¶41; ESI Answer ¶62.

lower costs for our customers.  We believe that there is a significant value capture to be realized by our customers and our shareholders.

The current contract with ESI entitles us to that value effective December 1 of 2015, which was just over a month ago.  In our existing contract, there's a very specific language that states that Anthem will conduct a market analysis and enter into good faith negotiations to ensure our members are receiving competitive benchmark pharmaceutical pricing.  ***Importantly, the language in this repricing provision does not include any requirement for a contract extension or any other contingencies for us to receive market-competitive pricing.***

To quantify the gross savings afforded under our contract, we've used multiple independent reference points to determine and validate appropriate competitive benchmark pricing.  These include the issuance of RFIs to competitive vendors and third-party expert consultants who performed their own market analysis.

***These reference points consistently showed that we are entitled to improved pharmaceutical pricing that equates to an annual value-capture of more than $3 billion.  To be clear, this is the amount by which we would be overpaying for pharmaceuticals on an annual basis.***  Obviously, this represents a substantial adjustment to drive lower care costs for our customers and improve our competitive position in the marketplace.

While our repricing provision was effective over a month ago, we do not yet have an agreement with our current vendor to effectuate the savings.  We have not yet received an offer from ESI that we believe represents market competitive benchmark pricing.  ***We're now trying to get them to engage in good faith negotiations as required under the terms of the repricing provision in our contract.***  To be clear, our shareholders are entitled to that value today and our team has been and continues to be focused on exercising our contractual rights to capture that value.

### 15. The Parties' Impasse Continues

206.    Even after Swedish's disclosure, the parties' impasse continued.  On January 13, 2016, Anthem informed ESI that it would "accept less than competitive benchmark pricing,"[75] and asking ESI to "provide Anthem with a reasonable proposal that at least approaches the competitive benchmark pricing provided for in the Agreement."[76]  Anthem further advised "that [its] willingness to accept less than competitive benchmark pricing as reflected in its proposal is

---

[75]Anthem Complaint ¶42; ESI Answer ¶63.

[76]Anthem Complaint ¶42; ESI Answer ¶63.

limited in time, so ESI needs to move quickly."[77]   There was no response from the Individual Defendants.[78]

207.   Anthem tried again on January 22, 2016, proposing a below-market pricing resolution.[79] Four days later, ESI, adopting the same tactic it had since March 2015, informed Anthem that it was not obligated to renegotiate pricing.[80]

208.   On February 3, 2016, Anthem representatives travelled to St. Louis, Missouri, to meet with Defendant Wentworth, acting as ESI's president.   During the meeting, Anthem expressed its willingness to limit its pricing reduction to $9.7 billion.   Defendant Wentworth, again, asserted that ESI was not obligated to offer any pricing reduction.

209.   In response to this unproductive meeting, Anthem urged ESI to reconsider its position.  On February 5, 2016, Anthem sent ESI a letter stating:

> As you know, Anthem has now spent almost one year trying to engage ESI in negotiations for competitive benchmark pricing, but ESI has refused to do so. Consequently, Anthem and its members are paying inflated prices to which is unsustainable.[81]

210.   Anthem continued:

> ***Anthem is prepared to overpay ESI by approximately $3.4 billion in an effort to get ESI to provide repricing as it is required to do*** (at much lower amounts) under Section 5.6 of the Agreement. …[W]e urge ESI to move quickly with respect to Anthem's proposal.  Otherwise, Anthem reserves all rights, including the right to the full amount of the pricing reduction necessary to achieve competitive benchmark pricing.

---

[77] Anthem Complaint ¶42; ESI Answer ¶63.

[78] Anthem Complaint ¶43; ESI Answer ¶64.

[79] Anthem Complaint ¶43; ESI Answer ¶64.

[80] Anthem Complaint ¶44; ESI Answer ¶65.

[81] Anthem Complaint ¶46; ESI Answer ¶67.

We have tried to avoid stating the obvious problem that ESI, as a competitor of Anthem's, is inflating Anthem's prices so that it can then undercut Anthem's prices. We ask ESI to reconsider that approach.

Anthem cannot continue under ESI's current pricing, so please respond to Anthem's proposal by next week.[82]

211.    On February 12, 2016, ESI responded with the same proposal it had sent on January 7, 2016, which had already been rejected.

212.    Four days later, the Individual Defendants caused Express Scripts to file its Form 10-K for the year ending December 31, 2015 with the SEC. As had been disclosed in prior 10-Ks, this 10-K disclosed that the Company continued to amortize the Agreement over a 15-year period, representing to investors that the Individual Defendants concluded that there remained a "high probability" that the Company's relationship with Anthem would continue beyond 2019.[83]

213.    In addition, this 10-K stated that the Company was "actively engaged in good faith discussions with Anthem and intended to continue to comply with the requirements of the agreement." But the Board knew otherwise.

214.    The day after the 10-K was released, Defendants Paz, Slusser, and Wentworth participated in a conference call to discuss the Company's 2016 results. During the call, Defendant Paz represented that the Company "remain[ed] fully committed to good faith negotiations in hopes of reaching a mutually beneficial agreement within the framework of our 2009 contract. That has not changed."

215.    In response to an analyst's question about why the 2015 price negotiations was more contentious than 2012's, Defendant Paz asserted that the Anthem price check was a routine

---

[82] Anthem Complaint ¶46; ESI Answer ¶67.

[83] This 10-K was signed by Defendants Paz, Slusser, McGinnis, Wentworth, Benanav, Breen, DeLaney, Granger, LaHowchic, Mac Mahon, Mergenthaler, Myers, Palmore, Roper, and Sternberg.

request, "a lot of our clients do have what we call price checks," and "have the right to look at pricing and make sure that we are doing the right things for them.  Those are pretty routine and we go through those, bunches of those, every year."  Defendant Paz also asserted that Express Scripts and ESI were "focused on reaching agreement" with Anthem.

216.   So, the Individual Defendants in the 10-K and Defendant Paz in his call with analysts represented to the investing public that Company executives were negotiating in good faith with Anthem (which they were contractually required to do), even though they continued to respond to Anthem's request for pricing adjustments based on its market check with the exact same inadequate number.  This is hardly the act of somebody who is "focused on reaching agreement" with Anthem.

217.   On February 18, 2016, ESI executives again refused to negotiate with Anthem, holding firm in its position that it was not obligated to negotiate Anthem's pricing terms.[84]

218.   On March 1, 2016, Swedish (Anthem's CEO) travelled to Chicago, Illinois, to meet with Defendant Paz directly—by-passing the presidents who had previously been negotiating.  At that meeting, Defendant Paz, on behalf of ESI, refused to negotiate, giving Anthem a "take it or leave it" ultimatum regarding ESI's January 7, 2016 pricing proposal, a proposal that had already been rejected twice.[85]

219.   More than two weeks later, showing a clear lack of interest in honoring its contractual duties to actually negotiate, ESI proposed the very same terms as it had on January 7, February 12, and March 1.  But, as the Individual Defendants knew, those earlier proposals had all been non-starters, and this identical one would fare no different.

---

[84]Anthem Complaint ¶49; ESI Answer ¶70.

[85]Anthem Complaint ¶50; ESI Answer ¶71.

220.    The Company executives' intransigent attitudes were obviously reckless to most observers.  For instance, Credit Suisse wrote of the dispute on March 15, 2016 that "Anthem is holding most of the cards in this dispute, and it likely has more power today than it ever will" but that the "limited disclosure" of the status of its relationship with Anthem by Express Scripts "ha[s] not been particularly helpful in terms of enabling the investment community to arrive at a reasonable estimate as to the value of [the future of its Anthem relationship.]"

221.    On March 18, 2016, Morningstar's analysis of the contract negotiation process was that: "Express [Scripts] has a material amount of room to negotiate and should be able to transfer enough economics to Anthem that will keep [Anthem] as a major client for several years beyond 2020."

222.    Finally fed up with the lack of movement on Express Scripts' part, however, Anthem filed suit against the Company on March 21, 2016, alleging that ESI was in breach of the Agreement, both for failing to negotiate pricing terms in good faith, and for failing to perform its PBM services in a "prudent and expert manner."

223.    Analysts reacted to this news with concern but were clear on who was to blame. For instance, the March 21 report from Morningstar determined that "the increased hostility of the [repricing] negotiations is a reflection of *issues beyond the current business dynamic*s of the partnership, and these *personal issues* have hindered a mutually beneficial outcome."

224.    That same day, Credit Suisse stated that "[t]he news [of the lawsuit] is disappointing relative to [their] optimistic view rational heads would prevail and a mutually beneficial agreement could be reached near term."  And, David Larsen of Leerink Partners wrote that the Anthem Action was an "indicator that there may be no renewal beyond 2019," further stating:

In our view this lawsuit suggests that Express Scripts and Anthem are still far apart in their views on appropriate renewal rates. The press report states that under the current PBM agreement, Express Scripts is obligated to negotiate in good faith to ensure Anthem is receiving competitive benchmark pricing. It further states that Anthem has worked hard for more than a year to try to get Express Scripts to engage in such good faith negotiations, but Express Scripts has refused to do so. This is consistent with ongoing public commentary made by Anthem that the company was entitled to a price check that should have gone into effect in December 2015.

225. ███████████████████████████████████████

███████████████████████████████████████████

███████████████████ ████[86]████████████



226. ███████████████████████████████████████

███████████████████████████████████████

227. ███████████████████████████████████████

███████████████████████████████████████

████████████████ It was not until April 25, 2016 that a press release and Form 10-Q filed with the SEC revealed that the Company had changed its amortization of the Agreement from 15 years to 10 years.

---

[86] 

[87] ██████████████████████████████████████

228.    Finally, on April 24, 2017, Express Scripts revealed that Anthem had formally informed the Company that Anthem would not be renewing its contractual relationship with the Company, so it was terminating its long-term relationship with Express Scripts when the Agreement expires at the end of 2019.  Thus, the Company has lost one of its largest business clients, a loss of billions of dollars in annual revenue.  As reported by the Company in its Form 10-Q for the Quarterly period ending March 31, 2017 filed with the SEC on April 24, 2017, the Company's contract with Anthem generated approximately 18% of the Company's total unaudited consolidated revenues and 33% of the Company's total EBITDA attributable to Express Scripts for the period.

229.    Since then, the Company has been tangled in several lawsuits including the Anthem Action, the ERISA Action, and the Securities Action.  Currently, the parties in the Anthem Action are actively engaged in the discovery process and trial is expected to be scheduled in late 2019.  The parties to the ERISA Action and the Securities Action are currently briefing their arguments in the Second Circuit Court of Appeals.

## THE SHARE REPURCHASE PROGRAM

230.    At the same time that the Individual Defendants were misrepresenting the true facts concerning the Company's relationship with Anthem, each of the Individual Defendants knowingly caused Express Scripts to overpay for shares of its common stock.  As detailed above, the Individual Defendants caused and/or allowed the Company to breach its contract with Anthem, which led to Anthem filing the Anthem Action, imperiling the remaining lifetime of the Agreement, and to Anthem declaring that the Agreement would not be renewed beyond the Agreement's initial term, contrary to the amortization that had been applied to the Agreement.  Moreover, the Individual Defendants caused or allowed the Company to make false and

misleading statements about the state of the Agreement and failed to properly recognize the risk that the Agreement would not be renewed and adjust the amortization accordingly, which led to artificially inflated prices.  The Individual Defendants permitted the Company to deplete its assets on a share repurchase program during the time period while the Company's share prices were inflated, even while knowing that the disclosure of the true facts concerning the Company's financial condition would inexorably cause the Company's stock price to decline significantly.

231.    Under the Company's accelerated share repurchase program, the Company repurchased $5.5 billion in Company stock, consisting of 55.1 million shares received in April 2015, and an additional 9.1 million shares received in January 2016.

232.    The Individual Defendants oversaw the Company's accelerated share repurchase program, and the Board authorized the Company to repurchase these shares.

## DERIVATIVE ALLEGATIONS

233.    Plaintiff brings this action derivatively in the right of and for the benefit of Express Scripts to redress injuries suffered, and to be suffered, by Express Scripts as a direct result of the violations of state and federal law, including breaches of fiduciary duty and violations of the Exchange Act, by the Individual Defendants.

234.    Express Scripts is named as a nominal defendant in this case solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.  Plaintiff was a stockholder of Express Scripts at the time of the transgressions of which he complains and continues to be a stockholder of Express Scripts.  Plaintiff will adequately and fairly represent the interests of Express Scripts and its stockholders in prosecuting and enforcing their rights.  On August 25, 2016, Plaintiff Elow sent a demand for books and records of the Company pursuant to Section 220 of the Delaware General Corporation Law, 8 *Del. C.* § 220.  After trial in Delaware's Court of Chancery in 2017, the Company was

ordered to produce certain of the requested documents. ████████████████████
████████████████████████████████████████████████ Plaintiff Elow decided to initiate this action on behalf of Express Scripts.

235.   Prosecution of this action, independent of the current Board, is in the best interests of the Company.

236.   The wrongful acts complained of herein subject, and will continue to subject, Express Scripts to continuing harm because the adverse consequences of the actions are still in effect and ongoing.

## DEMAND FUTILITY ALLEGATIONS

237.   Plaintiff has not made any demand on Express Scripts' current Board to institute this action since such demand would be a futile and useless act.

238.   The Express Scripts Board currently has 13 members: Defendants Paz, Breen, DeLaney, Granger, LaHowchic, Mac Mahon, Mergenthaler, Myers, Palmore, Roper, Sternberg, and Wentworth (the "Demand Defendants"), as well as non-Defendant Mazzarella (the "Demand Board"). If a majority of the Demand Board (at least 7) is found not to be independent or disinterested, demand is excused as futile.

239.   In fact, all 13 of the Demand Board members are conflicted due to the position they are taking in defense of the Anthem Action, Securities Action, and ERISA Action. In its 10-K for fiscal year ending December 31, 2017 filed on February 27, 2018, with respect to the Anthem action, for instance, the Board stated on behalf of the Company that: "We are confident in the strength of our legal position and believe we have consistently acted in good faith and in accordance with the terms of the agreement and have a number of valid defenses to the claims asserted. We further believe Anthem's lawsuit is without merit." The Demand Board has taken

similar positions in the Company's defenses against the allegations in the Securities Action and ERISA Action—both of which are currently on appeal in the Second Circuit Court of Appeals. If the Demand Board were to bring the claims at issue here, it would be tantamount to admitting liability in all three of these actions.  Demand is futile when, if the Company presses forward with its rights of action in this case, then the Company's efforts would undercut or even compromise the defense of the pending actions.

240.    Moreover, the Demand Board is dominated by the same Individual Defendants whose wrongful acts set forth herein have evinced an abdication of the fiduciary duties of loyalty, due care, good faith, candor, and oversight.   As detailed herein, the Individual Defendants were directly involved in the misconduct challenged in this action, by virtue of their active roles in the misconduct and by virtue of their respective positions on the Board and its Committees, ██████████████████████████████████████████████████ ████████████████████████████████ and/or as officers of the Company.  Therefore, a majority of the Demand Board would have been "interested" in (and therefore conflicted from and unable to fairly consider) demand because the directors face a substantial likelihood of personal liability due to ████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████

241.    In fact, each of the Demand Defendants knew that significant material information had not been disclosed to the Company's stockholders, including, but not limited to:







i. ████████████████████████████████████████

j. ████████████████████████████████████████

k. ████████████████████████████████████████

242. ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████

243. ████████████████████████, each of the Demand

Defendants, constituting 12 out of 13 members of the Demand Board, caused and/or allowed

improper and misleading statements and material omissions of fact in the Company's SEC

filings and communications with analysts.  Specifically:

    a. On February 23, 2015, representatives of Express Scripts filed a Form 10-K with the SEC for the year ending December 31, 2014 on the Company's behalf giving the investing public no reason to be concerned about chances of the Agreement's extension, just seven days after receiving a notice of default from Anthem.[99]

    b. On February 25, 2015, Company executives, including Demand Defendants Paz and Wentworth, held an investor conference call with

---

[96] ████████████████████████████████

[97] ████████████████████████████████

[98] ████████████████████████████████

[99] This 10-K was signed by Demand Defendants Paz, Breen, DeLaney, LaHowchic, Mac Mahon, Mergenthaler, Myers, Palmore, Roper, and Sternberg.

analysts (and the other Demand Defendants allowed them to), in which it was represented that the Company's relationship with Anthem was "very, very solid," even though Anthem had sent the first notice of default detailing a substantial number of operational breaches the week before.

c. On April 28, 2015, Demand Defendant Paz filed (and the other Demand Defendants allowed him to file) Form 10-Q with the SEC on behalf of Express Scripts, ███████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████ other than boilerplates disclosures that the Company faced potential risks from its "failure to execute on, or other issues arising under, certain key client contracts."

d. On May 8, 2015, ████████████████████████████████ ███████████████████████████████████████████ ██████████████████████ uring a conference call with Morgan Stanley, as part of the "CEO/CFO conference series," namely that the Company's "[m]anagement continues to view a strong relationship with Anthem … just over the halfway point of the original contract term, which goes to 2019."

e. On July 29, 2015, two days after receiving notice that Anthem was invoking the final step in the contract cancellation process, on July 29, 2015, Demand Defendants Paz and Wentworth participated in a call with investors and analysts, during which Defendant Wentworth informed investors that the Company's "performance to date and the positive feedback we continue to receive gives us confidence that we have strong retention across the board."

f. On December 22, 2015 Defendant Paz represented in a conference call with investment analysts, that the Company was "excited to continue productive discussions with Anthem." What Defendant Paz did not tell investors was that the Company (and an outside mediator) had recognized that negotiations were at an impasse, █████████████████████ ████████████████████████████ and that Anthem had completed every step necessary to terminate the Agreement

g. Representatives of Express Scripts filed Form 10-K with the SEC for the year ending December 31, 2015 on the Company's behalf on February 26, 2016. As had been disclosed in prior 10-Ks, this 10-K disclosed that the Company continued to amortize the Agreement over a 15-year period, representing to investors that the Individual Defendants concluded that there remained a "high probability" that the Company's relationship with

Anthem would continue beyond 2019,[100] ███████████████████
████████████████████████████████████████

244.    In making these improper and misleading statements and omissions of material fact, the Demand Defendants breached their duties.   Accordingly, all the Demand Defendants face a substantial likelihood of liability for their breach of fiduciary duties, making any demand upon them futile.

245.    ██████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
██████████████████████████████

246.    ██████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
██████████████████████

247.    As current President and CEO, Defendant Wentworth is also incapable of considering pre-suit demand because he depends on his positions for his livelihood.   The

---

[100] This 10-K was signed by Defendants Paz, Slusser, McGinnis, Wentworth, Benanav, Breen, DeLaney, Granger, LaHowchic, Mac Mahon, Mergenthaler, Myers, Palmore, Roper, and Sternberg.

Company's proxies estimate that Wentworth's compensation to be potentially worth more than $15 million.  In his position as President and CEO, Defendant Wentworth is beholden to the other members of the board, and the current Board is comprised of only one non-defendant.  He will take no action against the other Demand Defendants.

248.    Defendant Paz was the Company's President and CEO until May 2016. 

In fact, Defendants Paz and Wentworth were directly involved with and responsible for the price concession negotiations with Anthem on the Company's behalf.  Their recalcitrant and cavalier attitude toward negotiations with Anthem (even taking the position they didn't need to negotiate at all) were direct causes leading to Anthem's decision not to extend the Agreement.

249.

Accordingly, Defendants Paz and Wentworth are incapable of considering a pre-suit demand

250.    Moreover, the Demand Defendants, who served on the Board during the time period of the share repurchase program, approved and/or allowed the share repurchases in the hundreds of millions of dollars while the Company's stock price was artificially inflated, constituting a waste of Express Scripts' assets, at least to the extent of the overpayment for such shares caused by paying inflated market prices for the shares, and violation of the Securities Act.

Such waste further constituted a breach of Demand Defendants' fiduciary duties to the Company and its stockholders.

**COUNT I**

**Breach of Fiduciary Duty**
**(Derivatively Against the Individual Defendants)**

251.    Plaintiff incorporates by reference and re-alleges each and every allegation contained in paragraphs 1 to 250, as though fully set forth herein.

252.    Each of the Individual Defendants owed and owes Express Scripts fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe Express Scripts the highest obligation of loyalty, good faith, due care, oversight, fair dealing, candor and disclosure to stockholders.

253.    These Individual Defendants, and each of them, violated and breached their fiduciary duties of loyalty, good faith, due care, oversight, fair dealing, candor and disclosure to the Company's stockholders.

254.    Each of these Individual Defendants had actual or constructive knowledge that the Company's public statements about the Company's relationship with Anthem were misleading. The Individual Defendants directing or allowing or making such public statements to be made regardless of their lack of veracity could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

255.    Each of these Individual Defendants failed to ensure that the Company was meeting the terms of its Agreement with Anthem, and, therefore, caused the Company to breach the Agreement, failed to cure the breaches, and irreparably damaged the Company's relationship with its largest client.

256.     In addition, by their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting one another, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Express Scripts in a manner consistent with the operations of a publicly-held corporation.

257.     The Individual Defendants, particularly the Audit Committee Defendants, did not faithfully execute their primary responsibility for ensuring that the Company's financial statements and public disclosures had a sound basis in fact.

258.     As a direct and proximate result of the breaches of duty alleged herein, Express Scripts has sustained and will sustain significant damages.

259.     As a result of the misconduct alleged herein, these Individual Defendants are liable to the Company.

260.     Plaintiff, on behalf of Express Scripts, has no adequate remedy at law.

## COUNT II

**Corporate Waste**
**(Derivatively Against the Individual Defendants)**

261.     Plaintiff incorporates by reference and re-alleges each and every allegation contained in paragraphs 1 to 260, as though fully set forth herein.

262.     The Individual Defendants, while knowing that the price of the Company's common stock was artificially inflated through their misstatements and omissions alleged herein, nevertheless caused Express Scripts to repurchase approximately $5.5 billion worth of the Company's common stock at open market prices during the relevant period.  Each of these purchases was made at a time when the stock price was artificially inflated.

263.     As a result of these purchases, the Company was caused to waste its assets (cash) on share repurchases, at least to the extent of the excess of the open market prices paid for such

stock over the actual value of the shares but for the inflation caused by the Individual Defendants' misstatements and omissions.

264.    The exchange of cash for common stock occasioned by these repurchases, accordingly, was so one-sided that no person of ordinary, sound business judgment could conclude that Express Scripts received adequate consideration for the shares it repurchased.

265.    The Individual Defendants are liable to the Company for the amount of corporate assets thus wasted by them.

266.    Plaintiff, on behalf of Express Scripts, has no adequate remedy at law.

## COUNT III

### Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder
### (Against the Individual Defendants)

267.    Plaintiff incorporates by reference and re-alleges each and every allegation contained in paragraphs 1 to 266, as though fully set forth herein.

268.    During the relevant period, by the use of means or instrumentalities of interstate commerce, the United States mails, interstate telephone communications, and a national securities exchange, employing a device, scheme, or artifice to defraud, the Individual Defendants made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading, and engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the Company and its stockholders in connection with the Company's repurchase of its own shares during the relevant period, all in violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

269.    These false and misleading statements, and material omissions, artificially inflated the price of the Company's common stock.

270.    While the price of the Company's common stock was inflated, certain of the Individual Defendants caused Express Scripts to repurchase shares of its common stock at prices that were artificially inflated.  Between March 2015 and March 2016, the Company repurchased 64.2 million shares of Express Scripts stock at artificially high prices.

271.    The Individual Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary to make the statements made, in light of the circumstances, under which they were made, not misleading; and/or (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon Express Scripts in connection with the Company's purchase of its stock during the relevant period.

272.    The Individual Defendants, as the most senior officers and/or members of the Board of Directors of Express Scripts, and various Committees of the Board during the relevant period, are liable as direct participants in all of the wrongs complained of herein.  Through their positions of control and authority, the Individual Defendants were in a position to and did control all of the false and misleading statements and omissions made on behalf of the Company, including the contents of all the Company's public filings, reports, and press releases.  In addition, certain of these false and misleading statements constitute "group published information," which the Individual Defendants were responsible for creating.

273.    The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them and they had express responsibility for knowing such facts.  Such material misrepresentations

and omissions were made knowingly or recklessly and for the purpose and effect of concealing the Company's true financial and operating condition from its stockholders and supporting an artificially inflated price of the Company's common stock.

274.    As a result of the Individual Defendants' misconduct, Express Scripts has suffered and will suffer damages in that it paid artificially inflated prices for its common stock.  Express Scripts would not have purchased its common stock at the prices it paid had the market been aware that the market price of was artificially and falsely inflated by the Individual Defendants' misleading statements and omissions.   As a direct and proximate result of the Individual Defendants' wrongful conduct, Express Scripts suffered damages in connection with its purchases of Express Scripts common stock during the relevant period.   By reason of such conduct, the Individual Defendants are liable to the Company

275.    Plaintiff, on behalf of Express Scripts, has no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

a.      Against all of the Individual Defendants and in favor of Express Scripts for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, corporate waste, and violation of Section 10(b) of the Exchange Act;

b.      Directing Express Scripts to take all necessary actions to reform and improve its corporate governance and internal procedures to protect the Company and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder votes resolutions and amendments to the By-Laws and Articles of Incorporation, and any other measures able to guard against a repetition of the circumstances described herein,

including measures to reform the Company's internal governance documents and Charter of the

Audit Committee;

c.      Awarding to Plaintiff the costs and disbursements of the action, including

reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

d.      And such other relief as this Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: July 2, 2018                              Respectfully submitted,

**NEWMAN FERRARA LLP**


By: */s/ Roger Sachar*
Roger Sachar (MO Bar #61243)
1250 Broadway, 27th Floor
New York, NY  10001
Telephone: (212) 619-5400
Facsimile: (212) 619-3090
rsachar@nflp.com

-and-

**KAHN SWICK & FOTI, LLC**
Melinda A. Nicholson
   (*pro hac vice* to be submitted)
Michael R. Robinson
   (*pro hac vice* to be submitted)
1100 Poydras Street, Ste. 3200
New Orleans, LA  70163
Telephone: (504) 455-1400
Facsimile: (504) 455-1498
melinda.nicholson@ksfcounsel.com
michael.robinson@ksfcounsel.com

*Co-Counsel for Plaintiff Clifford Elow*